Will the attorneys who are going to argue the case please approach the podium, identify yourselves and the party you represent, and indicate to the panel how much time you would like to argue your case. I would request 20 minutes, Your Honor, for the main argument with 10 minutes for rebuttal. We'll give you 20 and 5.  Yes, I'm Jim Griffin with the law firm of Shane Banks here on behalf of Robert Arthur Land Co., LLC, the Appley Cross Appellant. 15 minutes would be sufficient for me, Your Honor. Mr. Griffin, you're no relation to Judge Griffin? I am not. Okay. Very well. I always do this to get a rise out of it. Thank you. All right. Mr. Leach. Your Honor. May it please the Court. This case arises out of a simple contract matter. Back in 2004, Ron March & Associates, a real estate investor, worked to acquire the rights to purchase 727 acres of real estate located in Kendall County. The property was in three distinct parcels, and Mr. March acquired the rights to acquire all three of those parcels. He sold those rights to Robert Arthur Land Company, which is a real estate developer. He sold them in 2005. The terms of this assignment were simple, straightforward, and are set forth in a written contract signed by all parties. The three purchase contracts were assigned to Robert Arthur Land Company. In exchange, March & Associates received an assignment fee of $350,000 that was paid up front. He was to receive reimbursement of his expenses, which he did not receive, and a back-end payment of $1,000 per lot approved for development, or alternatively, a substantially smaller payment of $250 per acre if the property was sold without zoning. March & Associates did not receive this back-end payment. We contend that the City of Plano, when it approved annexation and zoning ordinances in September of 2007, approved 1,538 lots for development. Has the zoning on the property ever been changed? The zoning on the property has not been changed to my knowledge, Your Honor. So how can you say they approved the zoning if it hasn't been changed? I'm sorry, the zoning was changed with the ordinances in 2007. It has not been subsequently changed. And what's the new zoning? The zoning that's at issue here was a hub zoning, but there was a residential zoning for 1,538 lots or units, whatever the term. And did they approve that zoning ordinance by City Council? Yes, that was approved by the Plano City Council. Along with the annexation and the annexation agreement. That's in the Record of Determinants 2007-35. So your contention is that he rezoned the property and it's still seven parcels of land, correct? At this point, yes, it is still seven parcels of land, Your Honor. How many lots are in those seven parcels? How many lots currently exist or how many lots have been approved? No, currently. Currently exist, there would be no lots, but currently exist. So has there been a plan of subdivision filed? Not a final plan of subdivision, Your Honor. Has any plan of subdivision been filed? A preliminary plan of subdivision. Filed and recorded? I believe it has been recorded, Your Honor. It was approved. No. Was it recorded? I believe it was, Your Honor. Go ahead. We believe, Your Honor, that this approval constitutes the requisite approval of 1,538 lots for development that triggers the duty of Robert Arthur Land Company to... Going back to the preliminary plan approved and recorded, are you saying that's a separate action beyond the annexation agreement and the zoning approval? There's another municipal action that approved the plan, approved the preliminary plan? I want to understand what you're saying. That was all in the one ordinance, Your Honor, 2007-05. So you're saying the annexation agreement, all of that, that was all one. It included preliminary approval of the plan. Yes, Your Honor. Was that the depiction that was attached? Is that what you're calling a preliminary plan? Yes, Your Honor. That was approved. That was set forth in a brief, a principal brief at page 11. I did not read one word in any of this briefing or the record that evidences that a plan of subdivision has been filed. Not preliminaryly approved. It was my understanding that that was the approval, and I believe it was recorded. The record may not reflect that, Your Honor. Well, what are we supposed to do? Go on your representation or on what the record shows? No, we should go on what the record shows, which clearly shows that it was approved. And that the recording I would submit that I would do. My question specifically, if you know what my question is, I see nothing in the record that shows that a plan of subdivision has been recorded on this property. There's nothing in the record. That is correct, Your Honor. So it's not been recorded. To my knowledge, no final plan certainly has not been recorded. It was my understanding that the annexation ordinance was recorded, and that included the preliminary. I'm talking about the final plan of subdivision. Yes, Your Honor. Just so we're perfectly clear. I apologize. Yes. Okay. No final plan of subdivision has been recorded. Okay. So back to my original contention. Is it your contention that the property has been rezoned officially, absent a final plan of subdivision? It has been rezoned in the annexation ordinance, Your Honor. You're either being very obtuse, or we're not communicating. Are you telling me your position is that absent a final plan of subdivision, having been recorded, you agree there is no final plan? I do agree. You're saying that the City of Plano has rezoned unplanted property. That's your contention. Yes, Your Honor. Okay. Now, this is what you're calling the preliminary plan? Yes, and perhaps I misspelled it. It was a preliminary plan, which I believe is the same as preliminary plan. Wait, wait, wait, wait, wait. You believe what? That the preliminary plan was the preliminary plan of subdivision. You believe that PUD, preliminary PUD, is the plan? Not the final plan. That's not been recorded. Correct. Do you mean a plot in accordance with the plot? How are you using the word plot? I'm using it as it was referred to in the ordinance and as it's set forth in our brief, that document. See, that's the problem. Your brief doesn't set forth accurately the law or the facts. F-A-C-T-S. Yes, Your Honor. We respectfully believe that it does and that that was the preliminary plan of subdivision that was approved. It was approved, not recorded. Correct? I believe that's correct, except insofar as recorded as part of the ordinance. But that isn't a recordable plan. I mean, it doesn't have any significance. The Plan Act has all kinds of requirements. Not a plan of survey. I'm sorry, that's bad. Well, no, what I'm saying is a plan of subdivision. It's not a recordable plan of subdivision. I understand it was an exhibit to the annexation agreement. The annexation agreement was recorded, so thus it was recorded. Yes, yes. But the Plan Act is very specific. Who has to sign it, the plan commission, the municipality. This is not a recordable plan. The engineer has to sign it. Yes, I think that's accurate. Now, and on this, and when I'm referring to this, I guess it's from the record C-495. It has down here in a blue box 1,538 units. Was that part of, oh, I see, it's down here. That's just highlighted. Yes, what we did, Your Honor, was to blow that up for readability purposes. Go ahead. We contend that that constitutes the requisite approval of 1,538 lots for development that triggers the duty to make the back-end payment. Let's talk about this equivalence of units and lots. I know that you have some testimony, but the reality is one lot could have several units on it, correct? Correct, but in this instance, the lots or the units that were approved were single-family homes. So there were no condominium or townhomes included in that approval? Not in these 1,538 lots or units. There were subsequent uses for other parts of the land that are not at issue that contemplated mixed use and commercial, but those are not at issue in our claim. Each of these units is a single-family home? Yes, Your Honor. You're not including condominiums? No. Townhomes? No. So if one were able to look at your exhibit to your brief preliminary PUD plan for North Country, these white squares would add up to 1,538 residential units? Yes, Your Honor. 1,500 of these white little squares? Yes, Your Honor. Go ahead. I'm just sorry. Just so I'm sure I understand, was this active adult duplexes on that same page 11 of your opening brief? Active adult duplexes, which sounds to me like more than one unit. I believe they were intended to be single-family homes. And then it's at the? Well, I see the area that your Honor refers to, those are different lots that are at issue. They're not at issue? Not as I understand this, Your Honor. It is the single-family homes that are at issue. So are you saying that there were 1,538 residential single-family homes approved, plus condominiums, plus townhomes, plus active adult residential units? Is that your contention? Yes, Your Honor. So that would result in substantially more residential units than 1,538, correct? At subsequent points in the development, yes. But it's all on this PUD, correct? Yes, and these are set forth on the PUD. So this PUD does not authorize 1,538 residential units. It authorizes substantially more than that, right? It would authorize substantially more than that. The city gave approval for the various other uses that are set forth on the PUD. Okay, so now you're limiting your claim to the residential units only? That has always been our contention, Your Honor. So a condominium unit is not a residential unit? Those are not the lots approved for development as contemplated by the party's contract. And where does it say that in the contract? That would be Section 7 of the contract, Your Honor, where it refers to the back-end payments of lots approved for development. Okay. Each residential lot approved for development. I'm sorry. Go ahead. No, but I'm still on page 11, and I'm just looking. I just think we want to be clear for the record. I'm looking at what adds up to 1,538 units, and as I'm reading this chart, it says duplexes, 124. And that's part of the 1,538. I just fortunately brought my reading glasses. You need more reading glasses, though. I have very strong reading glasses. I mean, is it or isn't it? Are they or are they not? Are they more than the single-unit residences or not? My understanding is that they are all in a single family. Okay. All the lots are residential lots. That all is an issue. All that your client is contending that it was supposed to be paid for were the single-unit residences. The specific residential lots that were approved, yes. And not the condominium lots. Correct. Well, the village authority who was deposed said that the planned unit development was entitled to 2.28 residential units per acre. And if you multiply your 750 acres times 2.28, that approximates to 1,538 residential units, which would seem to me to be the upper limit of residential units for this whole planned unit development, which would mean a senior citizen's development, a condominium, a detached, attached townhome, freestanding, all of them could not exceed 1,538. So your argument, frankly, doesn't make sense. And then... We're trying to understand your argument. Certainly, Your Honor. And essential to understanding your argument is the contract says residential lots approved for development. And your argument is single-family residences equals a lot. Yes. And your only support for that apparently is the testimony of Mr. March. Mr. March's testimony, we think that the plain language of the contract supports that interpretation as well, that each of these single residences was a lot approved for development within the meaning of the contract, bringing the total to 1,538. And where in the contract do you use the term, or is the term used, residential unit? Residential units is not in the contract, Your Honor. So how can you say we're relying on the plain language of the contract where the term residential unit is not in the contract? How does that make it plain language? We think the plain language is that lot is synonymous with unit, Your Honor. And your only support for that is Mr. March's testimony. Mr. March specifically testified as to that point. Mr. Karpus, the director of planning and zoning, also testified that these were approved. And what else did he say? He did draw a distinction that no lots had been created on the property, but our position is that is a subsequent step that will be taken as part of the development process that occurs after the approval of the development. These residences have been approved for development. The development has not yet taken place. That would include all of the engineering, all of the wastewater issues, recording of final plots of subdivision, et cetera. Our position is that the approval that's evidenced by Ordinance 2007-35 is a sufficient approval required by the contract to trigger the back-end payment. But this issue of synonymous, meaning they're interchangeable, units and lots? I think for purposes of the party's contract that that was what was intended. But it's very clear when we look at the structure of the timing of the back-end payment that it was meant that this zoning approval constituted the approval of lots for development. The back-end payment is set to occur on the occurrence of one of two things. One is the approval of lots for development. The second is the property being sold without zoning. To interpret lots for development as Robert Arthur Land Company would have you do creates a hole in the contract where there's a situation where the property can be sold with zoning, but as they interpret the matter, without lots approved for development. And it just creates a gap on the most significant component of the compensation of the agreement. So I think the logic of the contract, the language of the contract, the understanding of the parties, suggests that the lots and the residences here approved for development are. That may be true. And that is, I think, a good argument that we will certainly ask your opposing council about. But it seems to me that there's many situations where zoning may have occurred, but there are no specific lots approved for development. So that the general, the land could have been generally zoned. I mean, that gap is there. You may say you don't fall within it because you do have lots approved for development, but I believe that even if you did, there are going to be gaps in this contract. Correct? I mean, what if you didn't have a preliminary PUD plan that looked like this and was divided into units? You just had zoning. Would you still say, well, as long as there's zoning, we've got to figure out how many lots there would be? And that is a good point, Your Honor. I do think, though, that the parties always intended to proceed as a planned unit development, and so the contemplation was that the zoning and the PUD would all be approved simultaneously. And that is, in fact, what happened. So I suppose hypothetically a gap could have occurred. You never argued in the trial court that this contract was ambiguous, right? We don't believe that it is ambiguous. So if it's not ambiguous, why would we get into the intention of the parties? Well, I think we look at the intention of the parties as expressed by their language. There are ambiguous languages that the lots and the units are synonymous. That's how the parties conducted themselves. And I think, again, it is the logical interpretation of the contract here. Now, to the extent, and we have requested that the court reverse the trial court and award summary judgment in favor of Ron March and Associates, to the extent the court finds that there is ambiguity in the contract, then I think remand for trial would be the appropriate remedy. But we, again, we would contend that the evidence overwhelmingly establishes that lots and units were synonymous for purposes of this contract. And it's supported by the admissions of Mr. Slumke and supported by his correspondence at the time. Again, I'd like to highlight one point that we do mention in our brief, but in the deposition to Mr. Slumke where he admits that they owe the money and they've recorded the liability on the books of Robert Arthur Rand's company. Now, how can they calculate that amount if the lots and the units are somehow a different thing? The parties always act as if this is the approval. Their contention is it's a question of timing. Their contention is that they're not liable until the final plan of subdivision is recorded because nothing happens until the recordation of the plan. They contend also that the payments are not due until the properties are sold, which, again, I think is just unsupported by the plain language of the contract. The approval is what is mentioned in the contract, and the approval is what took place in 2007. But couldn't a final plan change the number of lots? Given that the ordinance requires that all of this proceed as has been set forth in the preliminary plan, we don't believe it would. Well, but it specifically says, as has been mentioned, that its preliminary delineation must be verified and subject to change. I don't know how you couldn't be clearer that it could change. I think that language refers to the specific mapping. The lines might change, but I don't believe the number of units approved for development would change. No, but you don't believe that, but they certainly could. I mean, engineering. We would have to speculate as to that, I think. I think the record is clear that that was the number of lots and units that were approved for development. Anything further? Thank you. If I may briefly again on the timing issue, the timing of the back-end payment speaks of one payment, and that's consistent with the rest of the text of the contract, whereby the payment will be made either on approval or on sale with zoning. The language that refers to the payment being due two days after closing refers clearly to the sale of unzoned property, which did not occur in this case. Approvals do not close, only sales do. So we think that the one payment was due immediately upon the approval of these lots for development. Well, and we'll again ask your proponent about that, but we don't have to agree that it waits for the sale. There is a lot of time between when you say it's due and when the units or lots actually get sold, correct? There are lots of different cut-off points, like approval of the final plaque, for example. Certainly, Your Honor, and we would say that the approval that was enacted was the appropriate cut-off point. If I may briefly touch on... But that would be, I'm sorry, that would be a one-time payment as well. Final plaque's approved, we know exactly how many lots there are, that would be a time at which the payment could be due, correct? Correct. If I may briefly touch on the cost appeal, I think that's very well covered in our brief. The contract did not provide Robert Arthur Land Company with any discretion to reject reimbursement amounts in the amount lower than $25,000. While Ron Munch and associates were slightly late in submitting its list of reimbursements, we contend that this is a trivial and minor breach of the contract to the extent it's even a breach at all. It certainly causes no prejudice to Robert Arthur Land Company, so we would respectfully request that the asserted court's judgment on Count 2 of the complaint be affirmed, and for the reasons set forth in our brief here today, we would respectfully request that the summary judgment entered on Count 1 of the complaint be reversed and summary judgment accorded to Ron Munch and associates. Can I just ask very quickly about the interest? Oh, yes, I'm happy to address that as well. We think that under the Interest Act, there's a vexatious and unreasonable delay of payments when pre-judgment interest is an appropriate remedy. We think that it was clear that the payment was due in 2007 when the approval was made, and therefore pre-judgment interest would be appropriate. But the Act says upon 30 days written notice that it mattered. So what was the written, when was written notice? Now, the complaint says that a demand was made. It doesn't say whether it was in writing or orally, and the answer admits that a demand was made, but I don't know, the date you say the approval, can't be the right date, because you have 30 days from written notice. So at a minimum, if they gave written notice on the date of the approval, it would be 30 days later, but was there some written notice? I believe that there was, Your Honor. I would have to go look in the record to find the specific date on which written notice was made, but I am confident that it was shortly after the approval took place. Because I couldn't find it in the record. Anything further? Nothing further, Your Honor. I was trying to ask questions. No. Thank you. Thank you. Mr. Griffin. Thank you, Your Honor. Please, the Court. First, before I begin my prepared remarks, let me point out, on the preliminary PUD plan, which we've all been talking about, near the bottom, but towards the right, there's a density count and a unit count. So you can see the first three numbers are for 15,000 square foot lots, 12,000 square foot lots, 7,000 square foot lots, and that total looks like it's about 700, 800 dwelling units there. And then below that, it's the single family attached, duplexes, traditional townhomes, courtyard townhomes, condominiums. And all those together add up to 1,538. So as we've pointed out, as Mr. Karpus testified, there are not 1,538 little white squares shown on this preliminary PUD plan. I don't think the record says how many white squares are shown, because I don't think anyone's ever bothered to count them. But we know the number is not 1,538. It's far, far less than that. I guess just for the record, the squares that are not single family, I don't believe are white. They're yellow. Or some of them. Some of them are different colors. There's duplexes. Again, it's not clear on this. This is not detailed enough to tell you where the units are going to be on the lots. This is a conceptual plan. As we argued, the contract between the parties doesn't define the key terms. There's no definition in there. But the contract does state that the residential lots must be approved for development by the city of Plano. So Plano is a non-home-rural Illinois municipality. And so it can only act by following state law requirements, which are bound to it, and by following its own terms of its own ordinances. And statutes and laws in existence at the time the contract is executed are considered part of the contract. So how does a non-home-rural municipality approve new lots? Under state law, you have to start with the product. That has to be followed. And that requires an engineer to prepare the plans for it to be signed off, for it to be approved and recorded. None of that has occurred. None of that has occurred. And there's no dispute about that. Well, what about the gap? I do know what you're talking about. For one thing, the terms of the contract itself as to when the $1,000 payment is due are clear. So to the extent there is a hypothetical gap that may occur or may not occur, that doesn't change the plain terms of the contract that the parties use. But if you sold everything right now, would the plaintiff be out of luck? Is that your position? We've never taken that position. No, we haven't, Your Honor. We have not ever taken that position. And I think Mr. Zwinke has testified that he believes that there are amounts that will be due in Owing at some point. And he has certainly said that. In fact, what the trial court did here was they didn't actually grant our motion for summary judgment. She found that the case was premature for a decision and essentially dismissed it, finding that the threshold requirement for a payment had not been made, those actions had not occurred, and therefore the case wasn't ripe to be determined. So back to our argument, Your Honor. The definition of a lot in the City of Plano subdivision code is a designated parcel, tract, or area of land established by a plaintiff's subdivision, recorded with the Kendall County Recorder of Deeds, and to be used, developed, or built upon as a unit. So, again, there's no question that there are no lots that have been created on this parcel or these parcels that meet that definition in the City of Plano's ordinances. And as was testified by Mr. Karpus and as was asked about during my colleague's argument here, there were seven parcels, unsubdivided parcels of land that constituted the annexation of this property. Today, there are seven parcels of unsubdivided land that are out there right now. There are no smaller lots that have been created here. Additionally, one key provision in the annexation agreement was that as a condition of development, and development is a term that's in their party's agreement, lots approved for development, as a condition of development in the annexation agreement is that the City of Plano build a $20 million wastewater treatment plant. And that is Plano's obligation, not my client's. My client's obligated to contribute, but they're not required to contribute the whole amount or to build it themselves. And Mr. Karpus testified, undisputed, the City has taken no steps to build this, and that the City would not approve lots for development when there was no sewer or water service available. So essentially, the plaintiff's argument to you is that the City has approved lots for development, even though none of these lots can be developed. And there's no dispute about that. So we believe that the trial court entered judgment properly in this case because no lots have been approved for development. What's your position as to when the payment would be due? If residential lots were approved for development, at what point would they be due? When the final plan is recorded, that would be it. The final plan, meaning the initial final plan. Understanding that a final plan can be amended if you file a second final plan. You could also plot this in phases, Your Honor. That's under the annexation agreement that's permitted. So 200 acres of this approximately 727 could be platted, final platted, depending on how many lots were on that final plat. That would create an obligation for payment and so forth. So would you have another obligation if there's a second final plat filed or recorded? Against the same property? Same development. No, but different property. Different property, sure. As the property was final platted, if it was final platted in phases, as each phase was platted, money would be due. Because that's the only way you ultimately know how many lots are out there. You have to wait until the final plat is recorded. So you would agree that if the initial final plat that is recorded called for the development of half the 750 acres, and they contain the final plat for those 375 acres, right? Right. There's 375 more acres that are anticipated to be developed in the future. A final plat of subdivision would be filed for that, and then there would be another payment due. Absolutely. For whatever number of lots were approved for residential purposes. Yes, Your Honor. No question about that. Your Honor, as for the cross appeal, it obviously involves far less money than the main appeal here. The thrust of our argument is that this was a real estate assignment contract. In fact, it wasn't a purchase contract. And it had due diligence dates. And the plaintiff was supposed to get information to my client according to a specific schedule, and we were to respond within the due diligence period. The plaintiff didn't submit any information to us within that period. But how are you harmed by that? I mean, the language of the contract says, 10 days after the date the assignor or the seller shall give the expenses. And I'm having trouble reading because this copy is pretty bad. But it says here, purchaser shall determine in its sole discretion that such expenses are not acceptable. Purchaser shall notify the assignor within 10 days if the receipt of such expenses were upon any obligations the purchaser here under or under any contract executed in respect thereof shall terminate. So their lateness extended your feasibility period and your ability to get out of this deal, according to what I'm reading, unless I'm reading it wrong. Your Honor, that's not my understanding of the contract. The due diligence period, once that expired, essentially the initial money went hard, to use the terminology that's used, and we couldn't cancel the contract at that point. So that's why the contract has, during due diligence, this requirement to provide information. That's the whole purpose of the due diligence period, to exchange information. So when one party waits until it's over and then submits the information, I don't think that's an immaterial nonconformance with the contract. I think that's material. Explain this language, though, because this seems to be in your favor. In your favor, yeah. Well, when you say in your favor, because it extends the period of time. Well, what it says is that you have ten days from whenever they give you the expenses to get out of the whole deal. So they're at risk by delaying. So I don't see the, I think it's an advantage, actually, as opposed to, and I do, and it does say someplace else, there's a fee. I think they don't use due diligence. I think they call it a feasibility period, but same thing. And I understand what you're saying. And that would have been a different lawsuit if that came up. And your interpretation may be correct, Your Honor. I could say that, you know, as a practical nature, when you've got a $350,000 deposit down there, are you going to take the position that the right to cancel the contract was extended by the failure to provide this information on time? You know, I don't know if I advise a client to rely on that. But in any event, we respectfully request that the Court affirm the decision as far as the back-end payment, and we have asked that you reverse the entry of summary judgment for the $22,000 of expenses. Did she dismiss it without prejudice to their right to bring it again when the payment is due? She did, and that's expressed in the final order. Yes, Your Honor. Okay. Thank you. Thank you. Mr. Leach. May I please the Court? Just very briefly, I did want to clarify that, I think we clarified it in the principle argument, but that it was the residential units which did include the single-family attached that was delineated on the preliminary pub plan that we're claiming. We obviously have no claim or interest in the land-zoned commercial. The second point I did want to bring up to note for the Court, we discussed a bit about the preliminary pub plan and the difference between the preliminary plats. Section 3.4 of the annexation agreement, this is set forth, I think, in my opponent's appendix, is Appendix 15. Section 3.1 does state that the preliminary pub plan serving as the preliminary plat, and that was the basis for my ñ I didn't mean to confuse the Court, but that was why I referred to that as a preliminary plat. To the point, I don't mean to confuse you. My questions all dealt with recording the plat. I understand. I just wanted to clarify that that was the basis. I was not trying to confuse the Court. I think as the opposing counsel points out in his argument, all of these things are part of the development process. Just today, right before I walked over, as Gap knows that the City of Chicago, the City Council, approved the President Obama Presidential Center. That approval has taken place. Obviously, there is no Presidential Center. There's a number of steps that need to be completed before that structure will come into existence. The same is true here. The lots have been approved. They haven't been created. There has been no final plat of subdivision, but that is the culmination of the development process, which was approved, the development process that was approved by the City of Plano. Creation is not approval. And I think, Counsel, I'm focusing on the need for the wastewater plant, the need for final plats. All of these things are part of the development process and occur after that development is approved. This is your opinion, correct? That, I think, is the only theory of the contract, and I think we're supported by the evidence. But I think that is the distinction. And I think when you look at That's why I just cringe at what you're saying, because I did some development work, and it is not as cut and dried as you are portraying it to be. Final is not final until it's final. Preliminary remains preliminary until it becomes final. Circular. Everything's subject to change when you're dealing with the municipality. Everything. So preliminary means maybe. Okay? It can all change until it becomes final. That's my experience. That, I think, is the experience of most developers. Maybe not their lawyers, but most developers. I think, Your Honor, that the plan that was approved was sufficiently specific and required development to occur along those lines that it is. Indeed, the approval of lots for development is contemplated by the parties. What about this box here that has these others included as part of the 1,300 units, including condominiums and townhomes that would? Again, I mean, I've never heard of a 12-unit condominium, but I've never heard of a 12-watt condominium, so the exact similarity of the term is not in my experience. But so the condominiums and the townhomes, you're saying they're not included in the 1,538? That was the point I wanted to clarify. They are included, Your Honor, and I apologize for misspeaking earlier. They were single-family residences, and I think I misspoke and referred to single-family detached homes, and I wanted to apologize and correct that. And you would agree that there can't be many single-family condominiums on a lot? On a specific piece of property, yes.  A lot. On a specific piece of property. Under the ordinance, under the Platt Act, under common understanding, a lot is a legally defined area of real estate. It can contain one dwelling unit or many dwelling units. But I do think that the individual condo units, as they can be sold, conveyed, and transferred, would constitute an individual lot for purposes of the parties' contract. Okay, anything further? Anything further? No, thank you, Your Honor. Thank you. Thank you. Thank you both for your presentations this afternoon. We'll take the matter under advisement. Thank you. Thank you.